UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL DORMAN, *et al.*,

      Plaintiffs,

                                    Case No. 15-cv-12552
v.                                   Hon. Matthew F. Leitman

TOWNSHIP OF CLINTON,

      Defendant.

_____/

## ORDER DENYING PLAINTIFFS' MOTION
## TO DISQUALIFY JUDGE (ECF No. 220)

In this action, Plaintiffs Michael Dorman and the religious organization he founded, River of Life Ministries, INT (collectively, the "Dorman Plaintiffs"), allege that Defendant Charter Township of Clinton violated the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and the First Amendment when the Township denied the Dorman Plaintiffs a special use permit that would have allowed them to operate a church on property they own in the Township. (*See* Am. Compl., ECF No. 8.) The Dorman Plaintiffs' claims have been pending for more than nine years. (*See* Compl., ECF No. 1.)  During that time, the Dorman Plaintiffs have been represented by five different retained attorneys, the fifth of whom appeared only recently in the action.

During the eight-plus years that the Dorman Plaintiffs were represented by their first four attorneys, the Court issued a substantial number of significant rulings

1

their favor, including granting River of Life's motion for summary judgment on its claim that the Township violated the Equal Terms provision of RLUIPA (*see* Order, ECF No. 99), granting the Dorman Plaintiffs' motion to disqualify the Township's co-counsel (*see* Order, ECF No. 75), denying in substantial part the Township's motion for summary judgment (*see* Order, ECF No. 94), and awarding the Dorman Plaintiffs an interim attorney fee award of $60,897.00 (*see* Order, ECF No. 64).  The Court also issued a lesser number of important rulings against the Dorman Plaintiffs, including denying a second request for interim attorney fees and striking their demand for punitive damages. (*See* Orders, ECF Nos. 109, 175.)  The Dorman Plaintiffs' first four attorneys did not suggest that any of the rulings against their clients indicated that the Court held any bias against either of the Dorman Plaintiffs. Indeed, at no time did any of the Dorman Plaintiffs' first four attorneys suggest that any acts or statements by the Court showed that the Court was biased against either Michael Dorman personally or River of Life, or that there was an appearance of such bias.

Things changed when the Dorman Plaintiffs' fifth attorney joined the case roughly four months ago.  Shortly after filing his Appearance, that attorney filed a motion for leave to supplement the Dorman Plaintiffs' Amended Complaint and to re-open discovery. (*See* Mot., ECF No. 213.)  The Court denied that motion for a variety of reasons. (See Order, ECF No. 217.)  New counsel then promptly moved

to disqualify the Court. (*See* Mot., ECF No. 220.)  He argued that the Court is

actually biased against the Dorman Plaintiffs and/or that there is an appearance of

such bias by the Court. (*See id.*)

New counsel has failed to establish that the Court should disqualify itself.  In

support of the request for disqualification, new counsel relies extensively on

statements made by the Court years before he (new counsel) appeared in the case,

but the Dorman Plaintiffs' prior attorneys raised no concerns of bias with respect to

those statements.  More importantly, when the Court's years-old statements are read

in connection with other statements the Court made at the same time as the

challenged statements, it becomes clear that the challenged statements do not

evidence any actual bias against the Dorman Plaintiffs and do not give rise to an

appearance of such bias.  New counsel also argues that statements made by the Court

after he (new counsel) appeared in this action indicate that the Court may have

improperly obtained information about the Dorman Plaintiffs from an extra-judicial

source.  The Court did not do so.  Moreover, the Court's more recent statements do

not evidence any bias or appearance of bias against the Dorman Plaintiffs.

The bottom line is this: as explained in detail below, a full and fair reading of

the entire record in this action reveals that the Court is not actually biased against

Michael Dorman personally, River of Life, or the Dorman Plaintiffs collectively and

that there is likewise no appearance that the Court harbors such bias. The Dorman Plaintiffs' motion to disqualify the Court is therefore **DENIED**.

**I**

The Dorman Plaintiffs bring their motion to disqualify under 28 U.S.C. § 455. That statute provides that a district judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).  The statute further provides that a district judge "shall also disqualify himself" if "he has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(b)(1).  The Dorman Plaintiffs appear to seek the Court's disqualification under both of these provisions. (*See* Mot., ECF No. 220, PageID.7215-7216.)

The test for disqualification under the statute is "not based on the subjective view of a party." *Burley v. Gagacki*, 834 F.3d 606, 615–16 (6th Cir. 2016) (quoting *United States v. Dandy*, 989 F.2d 1344, 1349 (6th Cir. 1993)).  Instead, the statute "imposes an objective standard: a judge must disqualify himself 'where a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *Id.* (quoting *United States v. Adams*, 722 F.3d 788, 837 (6th Cir. 2013)).

The analysis of a disqualification motion starts from the premise that a federal district judge "is presumed to be impartial." *Scott v. Metro. Health Corp*., 234 F. App'x 341, 352 (6th Cir. 2007) (citing *United States v. Denton*, 434 F.3d 1104, 1111

4

(8th Cir. 2006)).    Thus, "[t]he burden is on the moving party to justify disqualification." *Burley*, 834 F.3d at 616 (citing *Consol. Rail Corp. v. Yashinsky*, 170 F.3d 591, 597 (6th Cir. 1999)).  And the burden is "substantial." *Denton*, 434 F.3d at 1111 (quoting *Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 664 (8th Cir. 2003)).  Moreover, a party seeking disqualification faces an "uphill battle" where the Court's alleged bias "ar[o]se during the course of current or prior proceedings." *Burley*, 834 F.3d at 616 (citing *Liteky v. United States*, 510 U.S. 540, 555–56 (1994)). Indeed, as the Supreme Court has explained:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Liteky*, 510 U.S. at 555.

## II

The Dorman Plaintiffs' motion to disqualify the Court highlights statements made and questions asked by the Court at three different points in this litigation.  The Court addresses each set of statements and questions separately below.  None of the Court's statements or questions show that the Court is actually biased against either

Michael Dorman personally, River of Life, or the Dorman Plaintiffs collectively, or that there is the appearance of such bias.

## A

The Court begins with The Dorman Plaintiffs' contentions concerning the Court's conduct at a hearing on a motion to withdraw as counsel filed by the Dorman Plaintiffs' former attorney, Daniel Cortez. Cortez was the second retained lawyer to appear in this action on the Dorman Plaintiffs' behalf. He first appeared in May 2017 (*see* Appearance, ECF No. 24) and moved to withdraw in September 2020 (*see* Mot., ECF No. 117.) The Court held a hearing on Cortez's motion on November 9, 2020. (*See* 11/9/2020 Mot. Hr'g Tr., ECF No. 219.) The Dorman Plaintiffs find fault with two aspects of the Court's conduct during that hearing. Neither aspect evidences any bias against the Dorman Plaintiffs.

## 1

The Dorman Plaintiffs first contend that during the hearing, the Court improperly acted as an "[a]dvocate and [d]efender" of Cortez when the Court offered "praise" for Cortez's work on behalf of the Dorman Plaintiffs. (Mot. ECF No. 220, PageID.7225.) The Dorman Plaintiffs argue that a court's "praising counsel when the client has expressed dissatisfaction with counsel's representation implies that the Court sees counsel as blameless, and, consequently, the client as the problem." (*Id.*, PageID.7226.) Even though the two attorneys who represented the Dorman

Plaintiffs for roughly four years after Cortez withdrew (attorneys Venar Ayar and Joseph Falcone) raised no concerns about the Court's praise of Cortez, the Dorman Plaintiffs now insist that the Court's "[o]ne-sided praise hints at the bias of the [C]ourt." (*Id.*)

This argument fails to account for the context in which the Court offered praise for Cortez. The Court explained that it was praising Cortez because it was concerned that the Dorman Plaintiffs may have had unrealistic expectations about the path forward in the litigation, not because the Court viewed Michael Dorman (or River of Life) as responsible for the breakdown in his relationship with Cortez. The Court had the following exchange with Michael Dorman in that regard:

> THE COURT: All right. Let me – I want to share my thoughts with you again *because my concern here is about expectations and reality*.
>
> First of all, I've said this on the record several times and I want to say it again. From my perspective, Mr. Cortez has done an outstanding job on your behalf.
>
> MR. DORMAN: Mm-hmm, yes.
>
> THE COURT: Nothing short – nothing short of outstanding.
>
> MR. DORMAN: Mm-hmm.
>
> THE COURT: He has persuaded me to make important decisions on your behalf.
>
> MR. DORMAN: Mm-hmm.

7

THE COURT: He has advocated very aggressively with great civility and professionalism. His persistence is what I would say the maximum amount of respectful persistence that a lawyer can have and –

MR. DORMAN: Yeah.

THE COURT: – as far as I'm concerned, from the Court's perspective, Dan Cortez has been the model attorney in this case both in the way that he has dealt with me and the way that he has dealt with Mr. Peacock from what I can see in terms of, again, aggressiveness, persistence, and civility and professionalism. *And Mr. Cortez, while he's persuaded me to make a number of decisions on your behalf, there's been a number of times I disagreed with him and declined to do things that he asked me to do. Even though he was pushing very hard for them, there's no lawyer that could have persuaded me to take some of these steps and I want to make sure that you understand that to the extent that sometimes I've denied relief on your behalf, it is not in any way a reflection of a shortcoming by Mr. Cortez or in any sense a suggestion that any lawyer could have persuaded me to do something else given my view of the merits.  Do you understand that*?

MR. DORMAN: Oh, I do.

THE COURT: Okay. Now, the next thing that I want you to understand that's important is a point that I've made – this is a case where you've already won an injunction and you've already won the right to operate your church in this site and you've already been awarded a substantial amount of attorneys' fees.

And so your new lawyer, Mr. Ayar, is going to have to do substantial work to get up to speed to be ready for a trial of this case or be ready to do anything and I want you to understand, and him, I don't anticipate ever awarding duplicative legal fees for work that Mr. Cortez has already

done if Mr. Ayar has to do that additional work to catch up. Do you understand that?

MR. DORMAN: Ah, yes. The attorney and I have kind of –

THE COURT: Hold on.

MR. DORMAN: Oh, excuse me.

THE COURT: I will give you – I just want to kind of say my [piece] and then I'm happy to –

MR. DORMAN: Sure, yes.

THE COURT: The other thing, Pastor Dorman, I want you to understand and I made this point to Mr. Cortez many times – and he's not happy to hear it, he always pushes back – but the idea that there's a big pot of money or a big pot of attorneys' fees waiting for you at the end of this case is something that is open to very serious dispute. Mr. Peacock has a serious argument that he will make to a jury and he will make to me that this case should have stopped a long time ago when you guys got your injunction. And that that solved your claim for damages and that any attorneys' fees incurred after that were not reasonably necessary or at a minimum should be substantially cut down. I'm not saying I agree with that argument. I haven't seen it briefed and fully presented and I'm not saying that a jury will agree with that argument. But it's an argument that is a very serious one and needs to be considered very seriously on your side as you move forward. *If you are moving forward on the firm expectation that there's some sort of a pot of money either in damages or attorneys' fees, if you have too high a confidence level in that at this point, I think that would be a mistake. Do you understand my view on that*?

MR. DORMAN: Oh, I hear you, yes, your Honor.

9

(11/9/2020 Mot. Hr'g Tr., ECF No. 219, PageID.7195-7198; emphasis added.)
Nothing about the Court's discussion of expectations and reality suggests that the
Court faulted Michael Dorman for his dealings with Cortez.

The Dorman Plaintiffs' argument that the Court offered "one-sided" praise of
Cortez in a way that suggested a bias against the Dorman Plaintiffs also ignores the
Court's positive statements during the very same hearing about the attorney the
Dorman Plaintiffs had retained to replace Cortez, Venar Ayar.   The Court
"welcome[d Ayar] to the case," told Ayar that it "look[ed] forward to working with"
him and the other attorneys as the case "move[d] forward," and told Ayar that it "was
pleased to have [him] in the case and look[ed] forward to [his] constructive additions
to the process." (*Id.*, PageID.7202, 7204.)  The Court did not single out Cortez for
friendly treatment.

Next, the Dorman Plaintiffs argument makes too much of the timing of the
Court's praise of Cortez.  The Dorman Plaintiffs say that the praise was an especially
strong indicator of the Court's bias because it (the praise) was offered at a time when
Cortez and the Dorman Plaintiffs were at odds with one another.  But that contention
ignores that the Court had repeatedly praised Cortez earlier in the action – when he
and the Dorman Plaintiffs were seeing eye to eye.  For example, in 2018, at the
conclusion of a nearly three-hour hearing on the Dorman Plaintiffs' motion for
partial summary judgment and their motion to compel discovery, the Court noted

10

that Cortez had "presented excellent arguments" on the Dorman Plaintiffs' behalf and explained that it was "a real privilege to participate in these discussions with" him and a "privilege to work with lawyers [like Cortez] that do such a great job on behalf of their clients."[1] (6/26/2018 Mot. Hr'g Tr., ECF No. 76, PageID.2791.)  The Dorman Plaintiffs also ignore that the Court repeatedly praised their other attorneys at times when those attorneys and the Dorman Plaintiffs were seeing eye to eye. (*See e.g.*, 01/31/2023 Mot. Hr'g, Tr., ECF No. 195, PageID.6858, praising the Dorman Plaintiffs' attorney Joseph Falcone for the "really good work [Falcone] did" presenting "thoughtful arguments" to the Court on the Dorman Plaintiffs' behalf.) Simply put, a full and fair reading of the entire record shows that the Court consistently praised Cortez and the Dorman Plaintiffs' other lawyers.  When viewed in the context of the full record, the fact that the Court continued to offer such praise when Cortez moved to withdraw is not evidence that the Court was biased against the Dorman Plaintiffs.

Finally, the Dorman Plaintiffs have not cited a single case in which any court has deemed comments like those the Court made about Cortez to be improper.  In the Dorman Plaintiffs' discussion of the Court's statements about Cortez, he cites

---

[1] Likewise, during a 2017 hearing on the Dorman Plaintiffs' motion for preliminary injunction, the Court praised Cortez for "working cooperatively" with the Township's counsel to resolve outstanding issues in this case. (10/25/2017 Mot. Hr.g Tr., ECF No. 46, PageID.1227.)

*United States v. Hickman*, 592 F.2d 931 (6th Cir. 1979), *Baker v. Peterson*, 67 F. App'x 308 (6th Cir. 2003), and *United States v. Scott*, 257 F.2d 377 (7th Cir. 1958), but the actions by the courts in those cases bear no resemblance to the Court's statements about Cortez here.   In *Hickman*, the district court deprived a criminal defendant of a fair trial by "voluntarily interject[ing] itself in[to] the proceedings over 250 times," *Hickman*, 592 F.2d at 932, and by interrupting and undermining defense counsel's examination of key witnesses. *See id.* at 934–35.   In the Sixth Circuit's words, the district judge appeared to the jury as a "surrogate prosecutor." *Id.* at 936.   Likewise, the district judge in *Baker* unreasonably interjected himself into certain proceedings. *Baker*, 67 F. App'x 308.   For instance, he convened an evidentiary hearing and conducted "40 transcript pages" of his own questions, and he also "frequently interrupted counsel's 'cross-examination' to pursue theories of his own." *Id.* at 310.   Finally, in *Scott*, the district court highly praised the federal prosecutor in a "speech" that the court made "to the jury." *Scott*, 257 F.2d at 376–77.   In reversing the defendant's conviction, the Seventh Circuit explained that "[w]hen a judge extols counsel *for any jury trial litigant* as an exemplar immediately after counsel has purposely and successfully placed in evidence *before the jury* highly prejudicial testimony such partiality would exert such a strong controlling influence *on the jury* against the adverse party as to preclude any possibility of a fair trial." *Id*. at 377 (emphasis added).   In this case, in praising Cortez, the Court did not

12

interrupt the Dorman Plaintiffs' lawyers, commandeer any of their witness examinations, and/or elevate Cortez in the eyes of jurors. Thus, the caselaw cited by the Dorman Plaintiffs does not support their argument that the Court's praise for Cortez warrants disqualification.

## 2

The Dorman Plaintiffs also argue that during the hearing on Cortez's motion to withdraw, the Court "improperly asked [Michael Dorman] who was responsible for the breakup between [the] Dorman [Plaintiffs] and Cortez." (Mot., ECF No. 220, PageID.7224.) According to the Dorman Plaintiffs, the Court's question violated the "Michigan Rules of Judicial Conduct." (*Id.*, PageID.7225, citing an ethics opinion issued under the auspices of the Michigan Rules of Judicial Conduct.) There are two problems with the Dorman Plaintiffs' argument that the question the Court posed to Michael Dorman was improper.

First, the Dorman Plaintiffs have not cited any authority suggesting that the Michigan Rules of Judicial Conduct apply to United States District Judges. Federal judges adhere to the Code of Conduct for United States Judges.

Second (and more importantly), the Dorman Plaintiffs have failed to show that the Court violated the Michigan rule on which they rely. The Dorman Plaintiffs' own authority demonstrates that the Michigan rule does not entirely preclude the Court from asking any questions about why a party seeks to discharge its counsel.

13

Instead, as the judicial ethics opinion quoted by the Dorman Plaintiffs states, a court should generally not require "a lawyer to reveal information protected under [Michigan Rule of Professional Conduct] 1.6" – *i.e.*, *privileged information* – when adjudicating the lawyer's motion to withdraw. Mich. Rules of Judicial Conduct, JI-154 (Feb. 10, 2023).  Here, the Court expressly carved privileged information out of its question to Dorman: "*Without sharing with me any attorney-client communications*, can you tell me why it is that you now want to switch lawyers for the second time with so much of this case having been completed?" (11/9/2020 Mot. Hr'g Tr., ECF No. 219, PageID.7194; emphasis added.)  Thus, the Court's question avoided the problem identified in the authority on which the Dorman Plaintiffs rely.

The Dorman Plaintiffs seem to suggest that it would have been impossible for Michael Dorman to explain why the Dorman Plaintiffs wanted to switch lawyers "without divulging attorney-client communications." (Mot., ECF No. 220, PageID.7222 n.2.)  The Court disagrees.  Litigants frequently tell the Court why they want a new lawyer without revealing the content of privileged communications. They say non-privileged things like "my lawyer does not timely return my calls"; "my lawyer does not fully answer my questions"; "my lawyer and I do not see eye-to-eye on strategy"; "my lawyer is pre-occupied with other matters"; and "my lawyer is not fighting hard enough for me."  Indeed, in this very case, Michael Dorman was able to explain why the Dorman Plaintiffs wanted new counsel without revealing

14

any privileged communications.  He told the Court that he and Cortez had "billing issues" and that Cortez had "brushed off" other unidentified concerns that he (Michael Dorman) had raised with Cortez. (*Id.*, PageID.7195.)

For all of these reasons, there is no merit to the Dorman Plaintiffs' argument that the Court improperly inquired into the reasons for Cortez's withdrawal.

## B

The Court next turns to the Dorman Plaintiffs' contention that statements made by the Court relating to attorney Robert Davis illustrate the Court's bias against the Dorman Plaintiffs.  On April 23, 2018, Davis appeared in this action as co-counsel for the Township. (*See* Appearance, ECF No. 51.)  At that point, the action had been pending for nearly three years.  Davis focused his efforts on motion practice.  He filed briefs supporting the Township's motion for summary judgment.  He also filed a brief and offered oral argument opposing the Dorman Plaintiffs' motion for partial summary judgment.

On September 12, 2018 – nearly five months after Davis appeared in the action and nearly three months after Davis presented argument in opposition to the Dorman Plaintiffs' motion for partial summary judgment – the Dorman Plaintiffs moved to disqualify Davis. (*See* Mot., ECF No. 63.)  In support of the motion, Michael Dorman attested that in 2014 – four years before Davis appeared in this action on behalf of the Township – he (Michael Dorman) had spoken by phone with

15

Davis and had disclosed confidential information about future plans for River of Life. (*See* Michael Dorman Certification, ECF No. 63-1, PageID.2343.)  Michael Dorman did not say that he had formally retained Davis or paid Davis any money for any legal services.  The Dorman Plaintiffs nonetheless argued that the Court should disqualify Davis on the basis that Davis had entered into an attorney-client relationship with them in a related matter and that Davis therefore could not appear against them in this action.

Davis and the Township opposed the motion.  They argued that disqualification was not required because, among other things, Davis (1) had no recollection of any four-year-old communications with Michael Dorman and (2) did not provide any legal advice to the Dorman Plaintiffs. (*See* Resp., ECF No. 65.)

The Court held a hearing on the Dorman Plaintiffs' motion.  At the conclusion of the hearing, the Court ordered the parties to file supplemental briefing addressing, among other things, whether the Dorman Plaintiffs waited too long to seek Davis' disqualification. (*See* 10/16/2018 Dkt. Entry.)  The parties filed their supplemental briefs, and on November 20, 2018, the Court ruled on the motion. (*See* Order, ECF No. 75.)

The Court did exactly as the Dorman Plaintiffs asked: it disqualified Davis from representing the Township in this action. (*See id*.)  The Court concluded that disqualification was required under the governing ethical standards and that the

16

Dorman Plaintiffs had neither acted "in bad faith" nor "waited too long to file [their]

motion to disqualify." (*Id.*, PageID.2702.)  The Court ended its order disqualifying

Davis with the following passage:

> While the Court ultimately concludes that disqualification
> of Davis as counsel for Clinton Township is warranted, it
> reaches that conclusion reluctantly. Davis has shown great
> candor since he appeared in this action, and it has been a
> privilege to have him in front of the Court. He has
> faithfully and ably represented Clinton Township's
> interests, and his arguments have provided substantial
> assistance to the Court as it has wrestled with the
> complicated legal questions at issue in this matter.
> However, given the unrefuted evidence that [the] Dorman
> [Plaintiffs have] provided the Court, out [of] an abundance
> of caution, the Court concludes that disqualification is
> appropriate.

(*Id.*, PageID.2702-2703.)

The Dorman Plaintiffs say that the statements "hint" at the Court's bias against

them. (*See* Mot., ECF No. 220, PageID.7227.)  More specifically, they say that the

statements reveal "the Court's tendency to take the side of the attorney when

challenged by [the] Dorman [Plaintiffs]." (*Id.*)  The Court disagrees.

It is difficult, if not impossible, to reconcile the Dorman Plaintiffs' argument

of bias with the actual ruling of the Court.  The Court did not "take the side of the

attorney when challenged by [the] Dorman [Plaintiffs]."  It did the opposite.  It took

the Dorman Plaintiffs' side, rejected the attorney's (Davis') arguments, ruled in the

Dorman Plaintiffs' favor, and forced the attorney (Davis) out of the case over the

Township's vigorous objection. (*See* Order, ECF No. 75.)  The Court's decision to grant the Dorman Plaintiffs' motion and disqualify Davis does not demonstrate any bias *against* the Dorman Plaintiffs.

Lastly, the Dorman Plaintiffs again make too much of praise offered by the Court.  As indicated above, it is the Court's regular practice to praise lawyers for high-quality legal arguments.  The Court has repeatedly followed that practice in this case – with respect to counsel for *both* sides.  In this larger context, the Court's compliments for Davis do not evidence any bias against the Dorman Plaintiffs.

## C

The Court finally turns to the Dorman Plaintiffs' contention that statements made by the Court during a status conference on September 23, 2024, evidence the Court's bias.  That conference marked the first appearance in the action by the Dorman Plaintiffs' fifth retained attorney.  Much had happened in the eight years of this action before the conference: four of the Dorman Plaintiffs' prior retained lawyers had withdrawn from the case, discovery had closed, the Court had ruled on summary judgment motions, a deadline for seeking leave to file supplemental claims had come and gone without the Dorman Plaintiffs seeking leave, and the Dorman Plaintiffs' fourth attorney had told the Court that the Dorman Plaintiffs were ready to proceed to trial.

The Dorman Plaintiffs' fifth attorney began the conference by telling the Court that he had encountered some delay in obtaining the case files from the Dorman Plaintiffs' fourth attorney. (*See* 09/23/2024 Status Conf. Tr., ECF No. 214, PageID.7124-7125.)  In response, the Court offered to assist. (*See id.*)  The Court said that if the Dorman Plaintiffs' fifth counsel had not obtained the files by the end of the week, the Court would convene a video conference with the fourth lawyer to direct him to deliver the files. (*See id.*)  The Court also asked the Township's attorney – who had a very collegial relationship with the fourth lawyer – to contact the fourth lawyer and to assist in communicating the need for the transfer of the case files. (*See id.*)

The Dorman Plaintiffs' fifth attorney then told the Court that he would be filing a motion to supplement the Dorman Plaintiffs' then-pending Amended Complaint and to re-open discovery.  (*See id.*)  The Court discussed that request with counsel.  During the course of that discussion, the Court told counsel that when the Court took up the motion, the Court would be "thinking about," among other things, the fact that the Dorman Plaintiffs were now on their fifth retained lawyer. (*Id.*)  The Court said:

> THE COURT: Mr. Levi, one of the things that you'll find from me is I am not one who hides the ball. And while you have suggested that perhaps there are some concerns with Mr. Falcone and the way he's handled the case, Mr. Falcone is, I think – and I'm not real good at math, maybe the fifth lawyer to be in this case on behalf of your

client[s], before you. We started with Susan – I can't remember her name right now, and then we went to Dan Cortez, then there was Mr. Ayar, Mr. Falcone. There were at least four lawyers before you, and some of them were replaced because they had issues with your client here. And so that is something that I will be thinking about when I'm going to decide whether we should be having more time here before trial. So, again, I share that just so you are not blindsided and you can talk about that in your motion. Okay.

(09/23/2024 Status Conf. Tr., ECF No. 214, PageID.7128-7129.)

The Dorman Plaintiffs have two complaints about the Court's statement. First, they say the statement shows that the Court obtained information about their relationships with their prior attorneys from an extra-judicial source. Second, they argue that the statement "patently revealed [the Court's] bias and prejudice." (Mot., ECF No. 220, PageID.7228.) The Court disagrees on both points. The Court addresses the points in reverse order below.

## 1

The Court begins with the Dorman Plaintiffs' contention that the statement demonstrates the Court's bias against them. That argument rests on their interpretation of the Court's statement. They understand the Court to have been saying that their prior attorneys disapproved of them and/or the way they wanted to conduct the litigation. That interpretation of the Court's statement is not necessarily unreasonable. But that is not what the Court meant. The Court did not mean to blame the Dorman Plaintiffs for causing issues with their prior attorneys. Instead, the Court

20

meant only to observe that issues and problems had arisen – no matter who was to blame – in the relationships between the Dorman Plaintiffs and more than one of their prior attorneys.   Admittedly, the Court could have used more precise language to make this point.

But the question remains: why was the Court making any statements concerning the Dorman Plaintiffs' relationships with, and repeated substitutions of, their prior lawyers?  The answer is twofold – and neither reason for making the statement evidences any bias by the Court.  First, the Court believed that when deciding whether to further extend the schedule (as requested by the Dorman Plaintiffs), it was appropriate to consider whether problems between the Dorman Plaintiffs and their retained counsel – no matter who caused them – had impacted the efficient progress of the action.[2]   The Court's consideration of whether the Dorman Plaintiffs' prior substitutions of counsel may have weighed against granting their request to further extend the schedule is not evidence that the Court harbors a bias against the Dorman Plaintiffs.

---

[2] The Court was not alone in its view that changes in counsel may undermine the efficient progress of this litigation.   Indeed, when the Dorman Plaintiffs' third attorney, Venar Ayar, entered the case in place of Cortez, Ayar "agree[d]" with the Court that "it would be probably most efficient for Mr. Cortez to finish the case," and Ayar said that he "completely underst[ood]" the Court's concerns about his substitution into the case at such a late stage. (11/9/2020 Mot. Hr'g Tr., ECF No. 219, PageID.7201.)

Second, the Court made the statements concerning the Dorman Plaintiffs' prior changes in counsel in order to give them a preview of one aspect of the Court's thinking with respect to their anticipated motion to supplement their Complaint and re-open discovery.  And the Court then invited the Dorman Plaintiffs to "talk about that [issue of the prior substitutions] in [their] motion." (11/23/2024 Status Conf. Tr., ECF No. 214, PageID.7129.)   Simply put, the Court mentioned the prior changes in counsel in order to give the Dorman Plaintiffs a full opportunity to address the substitution of counsel issue before the Court ruled on their motion.  Providing such notice to the Dorman Plaintiffs does not evidence animus against them.

Notably, the Dorman Plaintiffs took full advantage of the Court's heads-up. Their fifth counsel argued in the Dorman Plaintiffs' motion that the substitutions of counsel and the reasons for those substitutions were not relevant to whether the Dorman Plaintiffs should be permitted to add supplemental claims or take additional discovery. (Mot., ECF No. 213, PageID.7021-7022.)  And counsel prevailed on that point.  While the Court did note in its order denying the Dorman Plaintiffs' motion to add supplemental claims and re-open discovery that the Dorman Plaintiffs were now on their fifth lawyer, the Court did not mention any problems that may have existed between the Dorman Plaintiffs and their prior attorneys. (*See* Order, ECF No. 217.)  More importantly, the Court did not rely on the fact that the Dorman Plaintiffs were on their fifth attorney as a reason for denying their motion; instead, the Court

22

explained that it was denying the motion for several other reasons. (*See id.*, PageID.7177-7178.)

In short, the Court flagged an issue for the Dorman Plaintiffs to address, considered their arguments on the point, and then, consistent with their arguments, did not factor their prior substitutions of counsel (or the reasons therefore) into its reasoning for denying their motion to supplement their claims and re-open discovery. This course of action did not evidence bias against the Dorman Plaintiffs.

Finally, the Court's statements about the Dorman Plaintiffs' changes in counsel here are a far cry from the conduct that troubled the Sixth Circuit in *United States v. Whitman*, 209 F.3d 619 (6th Cir. 2000), the primary case on which the Dorman Plaintiffs rely in the relevant section of their brief.  In *Whitman*, the Sixth Circuit reversed the defendant's sentence and remanded for re-sentencing before a different district judge because the sentencing judge had engaged in the following conduct:

> The district court lectured Whitman's counsel at length as to his ethical responsibilities and rebuked him repeatedly for his conduct in this case. Indeed, a hearing that could have been conducted in less than an hour took nearly four hours—much of which was gratuitously devoted to the behavior of Whitman's counsel rather than the length of Whitman's sentence. A sampling of the district judge's comments will suffice. "[M]y whole observation in this case is that so far [your client's interest] hasn't come first at all. You have only talked of yourself and never talked of your client...." "Now I hope that as a result of this conversation you'll re-examine your approach toward

23

what your role is in these proceedings and you will re-examine placing your ego and your pride above your client's interest, and I don't imagine you will, because people in your situation don't usually, but you might...." "[Y]ou need to explore in your soul the way that you have been conducting these matters routinely in the Court because your client couldn't possibly have done any worse than you did. And I want you to—I want you to think about that."

Most disturbing is a comment that can be read to imply that the conduct of Whitman's counsel would be held against Whitman. At one point, the district judge stated that Whitman's counsel would have "to go home and ask [him]self ... did I contribute to Ms. Whitman not getting her acceptance of responsibility, did I do that?" Examined in context, it is possible that the district judge was referring not to counsel's conduct before the court that day but to the advice that counsel may have given or failed to give to Whitman prior to her presentence interview. Regardless, a court should carefully guard against giving the impression that its holdings are motivated by animosity towards a party's counsel. *See generally Anderson v. Sheppard*, 856 F.2d 741, 745 (6th Cir.1988) ("The judge should exercise self-restraint and preserve an atmosphere of impartiality." (citation omitted)); *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358, 1361 (10th Cir.1977) ("Hence, appearance of impartiality is virtually as important as the fact of impartiality.").

*** 

In addition to chastising Whitman's counsel, the district judge also spoke at length about his perceived mission as a federal judge. "I'm not attacking you personally.... [T]hat's the furthest thing from my mind, but I'm trying to begin the process of educating the bar so that the lawyers, the last bastion of making up their own mind and doing what they want to do[,] will start to conform their conduct to the rules." "I'm trying to teach people, because I have

decided there is not much left in the United States for me to try to do except improve the practice of law...." "I didn't reach this conclusion overnight, it has taken me almost eight years to get to this point where I have resolved as to what the problems are and what we need to start to address...." "The question at the end of the day is have you had a serious intellectual discussion—whether the person listened or not—on issues which would improve the practice of the law, that's all I want to do...."

With all due deference to the district judge, the primary function of a judge is neither to "educat[e] the bar" nor to "improve the practice of the law." Above all else, the mission of a federal judge is to "administer justice without respect to persons, and ... faithfully and impartially discharge and perform all the duties incumbent upon [him] ... under the Constitution and laws of the United States." 28 U.S.C. § 453 (judicial oath of office).

*Id.* at 624–25.

The Court's conduct in this case bears no resemblance to the conduct described by the Sixth Circuit in *Whitman*. The Court did not lecture or rebuke the Dorman Plaintiffs' counsel, did not suggest that any animosity towards the Dorman Plaintiffs' counsel would be held against the Dorman Plaintiffs, and did not misperceive its primary function. *Whitman* thus does not support the Dorman Plaintiffs' argument that the Court should recuse itself.

**2**

The Dorman Plaintiffs further contend that the Court's statement about "issues" between the Dorman Plaintiffs and their attorneys reveals that the Court must have improperly obtained information about their relationships with counsel

25

from an extra-judicial source, such as "*ex parte* conversations with" one of those attorneys. (Mot., ECF No. 220, PageID.7219-7220.)  That is not true.  The Court did not obtain information about the status or workings of the Dorman Plaintiffs' relationships with their attorneys from any source outside of the record – and certainly not from *ex parte* communications with the Dorman Plaintiffs' attorneys. As set forth below, the record contained ample evidence that there were problems between the Dorman Plaintiffs and at least two of their attorneys, and the Court based its statements on that evidence and that evidence alone.

### a

To begin, the record contained direct evidence that problems had arisen between the Dorman Plaintiffs and Cortez and that they had mutually fallen out of favor with one another.  Cortez and Michael Dorman both confirmed that point during the hearing on Cortez's motion to withdraw.  The Court asked Cortez if there had been a mutual breakdown in the attorney-client relationship or if the complaints about the relationship were coming solely from the Dorman Plaintiffs' "side." (11/9/2020 Mot. Hr'g Tr., ECF No. 219, PageID.7193.)  Cortez responded that "both are true" – *i.e.*, that the dissatisfaction with the relationship was not coming solely from the Dorman Plaintiffs' side. (*Id.*)  Michael Dorman then described Cortez as someone who was "not in love with" him. (*Id.*, PageID.7195.)  Michael Dorman added that he and Cortez "have had an ongoing problem with billing" and that Cortez

had "brushed off" other concerns that he (Michael Dorman) had raised about this case. (*Id.*, PageID.7194.)  Given the statements by Michael Dorman and Cortez, the Court had ample basis for concluding that each of them had issues with the other.

<strong>b</strong>

The record also indicates that there were problems between the Dorman Plaintiffs and their first attorney, Susan Friedlander.  During a proceeding before the Court, Michael Dorman blamed Friedlander for some initial delays in getting the case moving.  He said that "virtually nothing occurred" with her and that given her failure to take any meaningful steps to move the case forward, he was "not sure exactly how she intended to go to trial with nothing." (*Id.*)  But the record reveals, contrary to Michael Dorman's criticism of Friedlander, that Friedlander had taken meaningful steps to advance the case.  By way of example, she had served several discovery requests – including requests for the production of documents and interrogatories and had requested depositions – and she filed a motion to compel when the Township failed to timely provide the requested discovery. (*See* Mot., ECF No. 22, PageID.244.)  Notably, when Cortez entered the case after Friedlander's withdrawal, he told the Court that the delays in the case had resulted not, as Dorman suggested, because Friedlander did "virtually nothing," but, instead, because the Township "repeated[ly] fail[ed] to provide answers to Interrogatories and offer dates for depositions despite such discovery requests being sent to [the Township]" much

27

earlier. (Mot., ECF No. 25, PageID.320.)  Cortez stressed that Friedlander "ha[d] been consistent in trying to arrange such depositions." (*Id.*, PageID.321.)  Simply put, there was a substantial disconnect between Michael Dorman's view that Friedlander had effectively abandoned the Dorman Plaintiffs and the evidence in the record reflecting her many actions on their behalf.  That disconnect suggested to the Court that there must have been, at least, a failure to communicate between the Dorman Plaintiffs and Friedlander.  The Court's view that there were "issues" between the two did not come from some other extra-judicial source.

## IV

For all of the reasons explained above, the Dorman Plaintiffs have failed to show that any statements made by the Court reveal that the Court is actually biased against them or that there is an appearance of such bias.  On the contrary, a full and fair review of the lengthy record in this case – which contains many significant rulings in the Dorman Plaintiffs' favor and not a single complaint about the Court from any of the Dorman Plaintiffs' four prior lawyers – reveals that the Court has fairly and impartially presided over these proceedings.  The Court will continue to do so.  Accordingly, the Dorman Plaintiffs' motion for the Court to disqualify itself is **DENIED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  January 13, 2025           UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 13, 2025, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126